ROANE, Judge.
This cause has been rightly considered as an important one: Not so much on account of the magnitude of the sum in dispute, (for, that is but a secondary consideration with every just government, and no consideration at all, with every upright Judge,) as on account of certain important principles involved in the discussion, and of an opinion which may have gone abroad, that the honor and justice of our country might be implicated. Whether, and to what extent, such an opinion may really exist at this time; or, from what source the impressions lately floating in the public mind, relative to this cause, may have been derived; whether from the incorrect allegations of interested •parties, (which I understand to have been even carried into prints,) or otherwise,T pretend not to say: But certain I am, that a decision founded on the basis of those impressions, of which, as a citizen, I could not 'be entirely ignorant, would be very different indeed, from one *which results from a minute and critical investigation of the contract, and testimony before us.
Many important points have been made in the discussion of this cause, and it has been very ably argued. If I shall pass over some of those points in silence, it is because I deem them unnecessary to>be decided: If I shall pass over without an answer, many objections which were taken, it is by no means for want of a due respect for the gentlemen who made them; but on account of that pressure of business, which now, as often heretofore, compels me to give, rather a general, than a detailed opinion, upon the case before me.
However unquestionable the claim of this Commonwealth, to unabridged sovereignty, as at the date of this contract, may be: However clear the position, that such a sovereignty cannot, without its consent, be impleaded before any human tribunal; it is not at this day to be questioned, (and it has, accordingly, been properly conceded for the Commonwealth,) that when such consent has been given, through the Legislative organ of our government, the objection on this score must cease. The only question then, on this part of the case, is, whether by a fair construction of the laws, a cognizance of the cause before us, has been yielded to this Court, and in that form of proceeding which the appellee has chosen to adopt.
It has been said on the part of the present appellee, that this foreigner, claiming the benefit of our laws, existing at the time of the contract, is not bound by the posterior lav/s, because he has never assented thereto: But, in fact he has never assented to any of our laws; and it is not on account of such assent, on his part, that he is bound by, or can take the benefit of them. A. better objection, on his part, wofild be, that the act of 1781 does not bind him, because it is a retrospective law: But even that objection would not avail; for, *it is not at this day to be questioned, ■that it binds our .own citizens, in whose favor the objection lies at least with equal force. That law is, indeed, a retrospective law; but one often sanctioned by the judgment of this Court; a law, dictated by imperious State necessity, and even by justice; its object being to give to creditors, the real value of their nominal contracts.
Putting this foreigner then on the same footing with our own citizens: nay, even on a better, if in a doubtful case, it be proved that he were ignorant of our laws and language; if, as I am ready to admit, he is more meritorious than a citizen, in serving the cause of liberty, in a strange land: He shall be considered as even a Virginia citizen, with these circumstances, in an equi-ponderant cause, ready to incline the balance in his favor. This is as much as ■would be granted in any country under Heaven, and this the benign and liberal policy of our laws will permit.
If the contract in question is proper for judicial cognizance, it is not necessary that that cognizance should have existed, at the time of its date; but, the contract construed indeed as to its operation by the laws then in being, may, when a tribunal shall afterwards arise for its decision, be properly submitted thereto. If this were not the case, what would become of innumerable instances in this Commonwealth of existing contracts being decided by newly erected tribunals? It would be impossible to foresee the extent, or consequences of a contrary position. But, in all the instances of pending improvements, in our Judiciary system, I have never heard of the objection being taken, either in the Legislature or elsewhere.
If this position be correct, the appellee, although his contract bears a previous date, is entitled to the benefit of that clause of the Auditor’s law of 1778, [c. 17, % 5, 9 Stat. Larg. S40,] allowing an appeal; ■ although as is supposed, *the original law of 1776, [c. 51, 9 Stat. Larg. 245,] has not a similar provision.
By that law, (the act of 1778,) a claimant, like the present had a right to have his claim audited; having. a claim upon the Treasury for money, and the laws denying him access thereto, through any other medium, than the Auditors’ board, except in those cases, where (which is not pretended in the present instance,) an act of Assembly shall forbid the claim to be audited.
This too was a case proper for the exercise of the Auditor’s discretion and judgment; for, although there was a written contract, it was a proper subject of his enquiry how far that contract had been complied with, how many goods had been. delivered pursuant thereto, &c. ; to say nothing of the question which afterwards arose, and is now contested, of specie and paper money.
If, then, there had been no interference on the part of the Executive, relative to this claim, no interception of the appellee’s regular progress to the board of Auditors, there is no doubt but that a decision against him, by that board, would create a jurisdiction in the Court of Chancery. What was the nature and effect of that Executive interference, arid what its influence in the present case? Por, I- put entirely out of the *471 question, the decisions of the legislature. An application to that body, for a gratuity, was proper; but, for a right, under a contract, an appeal to the Judiciary, was more proper; and possibly, on that ground, the rejection bjr the Legislature was founded.
A settlement by the Solicitor was not the proper course for a public creditor to pursue ; either as giving him access to the Treasury, or as entitling his case to a Judicial cognizance. Before, therefore, a conclusion shall follow, depriving a party of these privileges, and ousting our Courts of their ordinary jurisdiction, it ought at least to be shewn that the *party claimant agreed to a substitution of that officer in lieu of the Auditor, and waived his right of appeal from the decision of the latter. But, although the Solicitor was not invested with the proper functions of the Auditor, he was yet an useful agent of the Executive, in making statements relative to foreign claims, &c. : There is no testimony in this cause, that the Solicitor was applied to, in the instance before us, in any other sense than this: There is, I believe, no testimony, other than an ex parte representation by the Solicitor, that the agent of the appellee consented even to this reference: But, certainly, there is no testimony, that both (if either) of the parties, applied to this officer as a substitute for the Auditor: Nor, do I see that the report of the Solicitor was ever ratified by the Executive. The certificate of the Governor is merely that L. Wood was Solicitor, &c. It was his act, not that of the Council, and may be considered as merely a thing of course.
The Auditor ought not, therefore, on the ground of the existence of this settlement by the Solicitor, to have rejected the application of the appellee: But if, on the merits, his decision adopting in effect that of the Solicitor, was right, though founded on an improper reason, that decision must be affirmed by this Court.
This brings us to consider the case upon its merits.
The counsel for the appellee repeatedly brings us to the decision of questions, often and often settled by the supreme tribunals of this country, and which would, if disturbed, agitate and convulse the Commonwealth. Of this nature is the question, whether the act of 1781, [c. 22, 10 Stat. Barg. 471,] extends to contracts with the public. I do not consider myself now at liberty to discuss that question, and I only notice it, to shew that it has not escaped me.
*If, then, this act extends to contracts with the Commonwealth, as it unquestionably does, it clearly applies to the present contract, considered merely on its face and independent of other testimony. The contract is for “Virginia currency,” which terms are explained, by the act of 1781, to mean paper money, as at this sera: A great part of the debt is also to be paid in tobacco at 41. per cwt., whereas the ap-pellee now contends, that that article was then worth only twenty shillings, in specie. And, further, payment was to be made, of the balance of the contract, by warrants to be drawn upon the Treasury. I believe I may challenge the annals of those times, to produce a warrant drawn on the Treasurer, for specie. In fact there was none amongst us, or at least none in the Public Treasury; and we shall not presume, without express words, that the Executive of that day would have adopted an expedient, interdicted by law, and tending to damn the credit of that currency, which was the sine qua non of our liberty. These circumstances (without enumerating others,) are conclusive to establish a position, which is scarcely denied, and is corroborated by all the testimony in the cause, except Mr. Picket’s deposition: It is especially corroborated, by the credit given for 1,3001. paper money, in part of this contract. I shall, therefore, pass on, to that deposition, as the only evidence in the cause, Which can possibly present us with; a question whether, independently of the written contract itself, as on its face, it appears, either that no depreciation at all wás contemplated by the contracting parties, or a different rate of depreciation, from that which results from the application of the legal scale.
As I am decidedly of opinion, for reasons to be now assigned, that this testimony, admitting its fullest force, cannot possibly vary the construction, which would be made without it, it is unnecessary to enquire, whether and how far, parol testimony is admissible in a case similar to the present.
*In this view of the deposition, also, I shall lay no stress upon the circumstance of its being a solitary one, nor on the presumption arising against the present appellee, from the consideration, that better testimony might probably have been obtained by him, as appears from the record: Better, I mean, not in respect of credibility; but from a superior opportunity of knowing the real intention of the parties, at the time of the contract. This inference is drawn, inasmuch as persons are living, who attested the contract, and were present at its completion.
There is no decision in this country, which exempts a contract from the operation of the legal scale, upon testimony shewing a different idea in the parties, unless such testimony plainly related to the time of the contract. A contrary decision would involve the greatest absurdity, since, whatever ideas may have prevailed, at a prior time, may have been changed, and conformed to the legal scale, at the making of the contract. Neither is there any decision in this country, nor ought thereto be, which varies the application of the scale, in conformity to the ideas of one party only. A contrary idea is also pregnant with absurdity and injustice, since a legal right, vested in one, is to be divested by a secret, undivulged idea, existing in another contracting party. Now, it is remarkable, that Mr. Picket’s testimony, not only applies to a point of time, anterior to the date of the contract, (how long before, is not disclosed,) but relates, if at all, to the ideas of Mr. Chevallie only: It is, therefore, in a great measure, if not wholly, inapplicable to the case before us. If it be said, that the ideas of the State at *472 a previous time, may be inferred, from the offer of the State, stated by Mr. Chevallie, I answer, that this is not only the allegation of a party which cannot benefit him, but • relates not at all to the price of tobacco ; and, therefore, can give no rule for estimating depreciation in the present case.
*But, supposing it otherwise, what reasons does he assign? 1st. To shew that no depreciation was contemplation by the parties? Or, 2dly. A different rate of deprecition for that established by law?
As to the first, he says: 1 ‘We were informed that the supercargo proffered to sell the surplus of the cargo (after the State was supplied,) for specie, or tobacco at specie price.” But, who gave them this information? He does not say that Mr. Chevallie gave it: On the contrary, it is evidently hearsay testimony; and, as such, entitled to no credit. Besides, it only applies to the surplus of the cargo; and, if true, it does not follow that the residue of the cargo might not be for sale in paper; although I admit that this conclusion is improbable. He further says, as coming from Chevallie, that the -State had made him an offer of 6s. for each livre, for the whole cargo, which was a better offer than theirs: But, he does not add, as coming from Chevallie, (nor indeed from any. other,) that this 6s. was to be paid in specie, or tobacco, at specie price, although it is scarcely to be believed, that that agent would have omitted to mention that circumstance, if it had existed, or that the witness would have forg.otten it. Mr. Picket, indeed, infers this to have been the case, because the offer of the State was said to be a better offer than theirs, which he supposed could not be the case, unless that offer was in specie. Whether an offer in paper money was, in fact, a better offer, or not, is wholly immaterial. It is sufficient that the agent thought so; and his .opinion, in such a case, might involve numerous and various considerations: As, 1st. His opinion of the credit of the paper money, and its probable appreciation. 2dly. The superiorit}’ of the national credit over the individual credit of these adventurers, or, possibly, over any other individual credit whatsoever. 3dly. The offer of the State extending to his whole cargo; whereas, that of the merchants embraced the surplus only. And, 4thly. (Without extending the catalogue;) his ^possible opinion that Picket’s offer, though nominally an offer of 4s. 6d. specie, per livre, was in fact an offer of less; for, as it was to be paid in tobacco, at 20s. per cwt., it is evident that the offer would be diminished; in so far, as the tobacco was really worth less than the aforesaid sum in specie: Now, Mr. Picket has not proved, (nor has any other person,) that tobacco was really worth that price, in specie, at that time.
Mr. Picket indeed says, that if paper money would have been received, (but he was not informed by the agent that it would not,) they would willingly have given.20s. paper money, per livre, for the cargo: But, he admits at the same time that the offer was not made. If it had been made, and refused, it might have been a strong, though probably not, even then, a conclusive circumstance, from whence to infer Mr. Chevallie’s idea that the offer of the State was in specie. As the offer, however, was never made, no positive inference can be drawn therefrom. It serves, however, plainly to shew an existing state of things, at that time, which clearly refutes an idea that depreciation was not sensibly felt by the contracting parties. On Picket’s further allegation, that this offer was not made, because it was generally understood, that no sale would be made, but for specie, or tobacco, at specie price, I will only remark, as in a former instance, that it is merely hearsay testimony.
This testimony, then, is entirely insufficient to shew, that no depreciation was contemplated by the parties. How does it stand to shew that a different rate of depreciation was contemplated, from that established by law? If Mr. Picket’s, or any other testimony, had shewn, that, at the date of the contract, tobacco was really worth 20s. per cwt. in specie; or, that it was generally understood to be worth this; or, had shewn any circumstances from whence it could be fairly inferred, that both the contracting parties considered this as the *real specie value of that article: as the contract before us, has rated the tobacco at 41. per cwt. in Virginia currency, it might reasonably have been argued, that a depreciation of four for one was contemplated. But, the case is entirely naked in all these respects; and there are no proofs, or data, from which such a conclusion can possibly be drawn. On the contrary, the Auditor says, in his answer-, (and there being no conflicting testimony, it is immaterial to consider, whether this allegation be evidence in the cause, or not,) “that he believes tobacco could have been purchased, at the time of the contract, for less than 20s. per cwt. in gold or silver coin.” Now, if the Auditor is right in this opinion; if an actual diminution existed of 4s. from this conjectural price of 20s. per cwt. then it is evident, that so far from a different rate of depreciation being inferrable, a conformity would be produced between the supposed ideal, and the legal rate of depreciation.
If it be said, that Mr. Picket’s offer to pay tobacco at 20s. per cwt. might justly have excited an idea in Mr. Chevallie, that that was the real specie value of that article, I answer that, as a man of business, he must have known that merchants generally overrate their commodities in their dealings, and especially in their first overtures. Such an idea, therefore, cannot justly be inferred to have arisen from that offer. But, if it were otherwise, there is no testimony whatever, that this circumstance was ever made known to the other contracting party, and the idea of both parties must concur, before the legal scale be departed from. Besides, whatever may have been Mr. Chevallie’s opinion, at a prior time, on this subject, it shall rather be presumed that, at the time of entering into the contract, he had relinquished that *473 idea. In a state of total uncertainty, and an absolute deficiency of evidence, that presumption shall rather prevail, which corresponds with, than departs from, the law.
*In truth, therefore, this testimony of Mr. Picket is entirely too loose and unsatisfactory, to justify any departure from the written contract. We might as well at once repeal, and set at naught the law concerning depreciation, as to deny its application, on such testimony as the present. That law, (not losing sight of exceptions, to meet the real ideas of the parties,) was intended, and has had the effect, to prevent an infinitude of litigation; and no Court in this countr}’ has power to depart from it, except in cases excepted from the general rule therein laid down, either expressly in the act itself, or adjudged to be within the reason and meaning thereof, by the decisions of the Judiciary; and it is clearly supposed, that an exception, in so weak a case as this, has never been adjudged by any Court whatever, prior to the case before us.
Prom this view, it results as my opinion, that the Chancellor was right in deciding, that neither by the contract itself, nor by any evidence in the cause, do the 6s. per livre, appear to have been intended by the parties to have been in specie: But I differ from that Judge, in supposing the settlement by the Solicitor to have been unjust, and in setting the same aside, and substituting another rate of compensation in lieu thereof: Not only, because he had no power so to do, upon his own premises, because the offer of the merchants, which he has made the standard of the substituted compensation, is not proved to have been, in reality, an offer of 4s. 6d. per livre, for the reasons already assigned; but because, however unprofitable a bargain the appellee may have made, a circumstance which may be regretted, but not remedied, by this Court, there is no evidence in the cause, shewing injustice to have been done the appellee by the Solicitor’s settlement; or, in other words, no evidence to shew, that that settlement will not yield to him, the real value, in specie, of the currency contracted for, as at the time of the contract: And I cannot help here observing, as remarkable, *that the Chancellor, in a contract confessedly for paper money, should, for the attainment of justice, as he supposed, over-leap an express act of the Legislature, when at the same time, he would have considered himself inhibited from giving a sum in nature of damages, if necessary for the attainment of the same object, thereby giving to a principle of decision, adopted by the Courts, greater efficacy, than to a positive Legislative act!
Admitting, then, this creditor to be highly meritorious (for even he is meritorious who combines the public good with private emolument,) and considering the decision of the Auditor, in effect, as an adoption of the Solicitor’s settlement, though for an improper reason, I must be of opinion, that that decision is substantially right, and ought not to have been reversed by the Chancellor, but that the bill of the appellee ought to have been dismissed.
FLEMING, Judge.
Three points were made in the argument of this cause.
1st. Whether the Court has jurisdiction in the case?
2d. Whether the contract between William Armstead, the agent for the Commonwealth, and Chevallie, the agent of Beaumarchais, was a specie or a paper money contract?
3d. Whether, if it was a paper money contract, there are circumstances in the case sufficient to take it out of the general scale of depreciation, as established by the act of 1781?
With respect to the first, I have no doubt. The act of 1778, establishing the board of Auditors, is decisive. It declares, that “where the Auditors, acting according to their discretion and judgment, shall disallow or abate any article of demand *against the Commonwealth, and any person shall think himself aggrieved thereby, he shall be at liberty to petition the High Court of Chancery, or the General Court, according to the nature of the case, for redress; and such Court shall proceed to do right thereon; and a like petition shall be allowed in all other cases, to any other person who is entitled to demand against the Commonwealth, any right in law or equity.” The generality of these terms, which are copied into the act of 1792, embraces the present case, and leaves no room for dispute.
But it was argued by the counsel for the Commonwealth, that the act of 1780, [c. 15, 10 Stat. Larg. 358,] appointing a Solicitor General, and defining his powers and duty, took the business entirely out of the hands of the Auditor; and that the reports of the Solicitor, of the 16th of December, 1784, and the 6th of January, 1785, are conclusive and binding upon the ap-pellee. On recurrence to that act, however, the power will be found to fall far short of this. It is merely, “to examine from time to time, the books of accounts kept by the Board of Auditors, and to compare the same with their vouchers; to see that all moneys to be paid by their warrants, were entered and charged to the proper accounts therefor, or to the persons properly charged therewith, and that the taxes levied, be also credited to their respective and proper accounts, keeping all taxes raised under any one law, separate and apart from the other; to cause a correct list of all balances due, either to or from the public, to be stated, together with the amount of the several taxes, and lay the same before the General Assembly, at the first meeting of every session.” Which certainly cannot, by fair reasoning, be construed so as to erect the Solicitor into a definitive arbiter, between the State and the creditor: And much less to supersede the powers of the Auditors. On the contrary, he was not even authorised to settle and liquidate the claims *of individuals against the Commonwealth: His province was to examine into the regularity of the accounts, and from them to make his annual reports to the Legislature: There *474 fore, he could give no definitive sentence upon the subject.
From this v.iew of the case, then, I am clearly of opinion that the appellee had a right to his petition of appeal from the decision of the Auditor, and that this Court has j urisdiction .of the cause. Which brings me to the consideration of the second question : Whether the contract was for specie, or paper money?
The counsel for Beaumarchais laid great stress upon the risk he run, and upon what they called his generous conduct towards the State. Such arguments, if correct, should have been addressed to another tribunal : Here they can have no weight; for, his claim, according to the laws, is all that he has a right to aslc, or this Court has power to award. ■
I view the case, then, precisely, as if the contract had been made between two individuals : And to form a correct judgment of the intention, and understanding of the contracting parties, shall refer first to the writing itself; then, to the subsequent conduct of those concerned; and lastly, to the evidence that has been adduced to elucidate and explain it.
The written contract states, “That Mr. Chevallie be allowed six shillings Virginia currency, for each livre, which the said goods and merchandize cost in Francé, and in part payment therefor, Armstead to deliver along side of the said ship at York, 1,500 hogsheads of tobacco, within ninety days, to be reckoned from the day the said Armstead shall be notified of her arrival at York, at the rate of four pounds per cen-tum, and 500 hogsheads of tobacco more, along-side anjr ship Mr. Chevallie may send to Alexandria, on Potowmack river, within sixty days after the *said ship arrives at Alexandria; at the same rate of four pounds per centum: The balance that may then be due to Mr. Che-vallie, to be paid by warrant on the treasury of Virginia, to bear six per cent, interest, as long as he chooses to let it remain there, or be laid out for him in tobacco, for which tobacco he is to pay the costs, and all charges paid by our agent.’’
At the time of this contract, it must have' been known to Mr. Chevallie not only that there was no specie in the treasury, but that paper money was the sole currency of Virginia, then in circulation; and, from the advanced prices of every necessary of life, it must have been obvious that this currency was greatly depreciated; of which a stronger evidence could not have been adduced, than that furnished by Chevallie himself, who agreed to allow 41. per cwt. for 2,000 hogsheads of tobacco; when it might have been purchased, with specie, for twenty shillings; or, perhaps at a lower price. But this is not all: For, the whole cargo in the invoices, with a charge of fifteen livres on a box of shoes, cost in France 929,700 livres; which at six shillings the livre, amounted to 278,9101. Virginia currency. Deduct the 36,0061. for the goods retained by Chevallie, according to the contract and 80,0001. for 2,000 hogsheads of tobacco at 41. per cwt. and there remained a balance of 158,9041. due to Beaumarchais; which balance, by the contract, was to be paid in warrants on the Treasury, to carry* six per cent, interest, as long as Chevallie should choose to let it lie there, or to be laid out in tobacco, at his option. Now, can it be believed, that a man, extensively engaged in mercantile affairs, should have contracted for so large a sum in specie, to be called for at his pleasure, as exigencies might require, when he knew there was no specie in our Treasury, and very little in the State? or, that our Executive would have been so extremely indiscreet (to say no worse) as to have made a ^contract for specie to- that amount, to be paid when demanded, at a time they neither had any, nor the means of procuring it? To me it appears to be morally impossible. Had specie been contemplated, the insertion of that word in the contract was obviously the means of putting it out of doubt; and, therefore, it would not have been omitted, and currency substituted in its room. But there are other circumstances, which serve to strengthen the idea, that it was considered by the parties as a paper money contract: For, it appears, both by a memorandum of Mr. Armstead, and by an account exhibited by Chevallie, that he received in part payment for the cargo (but at what time is not stated) the sum of 1,3001. in paper money; for which he gave credit, at the nominal amount; thereby shewing that paper money was contemplated. But, it was said by the counsel for the appellee, that this circumstance should have little weight, as the sum (compared with the whole debt) was too trifling to be an object with Mr. Chevallie; and that he did not, at that critical period, wish to excite any uneasiness in the government, respecting the depreciation of our paper money. The argument, however, is more specious than solid; for, although the sum, compared with the whole contract, was not very-.large, yet 1,3001. were certainly sufficient to have attracted the attention of a man situated as he was; especially as, in another part of the account, he has entered the trifling item of 15 livres on a box of shoes; which discovers an anxious regard to the smallest sums. Besides, it could not have escaped a man of his understanding and experience in business, (had he really considered it as an agreement for specie,) that by receiving this paper money, and giving credit, for it, at its nominal value, he was furnishing a precedent that might very materially affect the whole - contract, at a future day: whereas, considering it as a paper money contract, his conduct in this respect, was perfectly consistent with the nature of the agreement. Considerable stress was laid on the circumstance of *Mr. Chevallie’s being a foreigner, anil unacquainted with our language; in answer to which, it may be sufficient to observe, that he had interpreters with him, both of whom were witnesses to the contract. Again, the whole of the goods (except a deficiency in salt, which it was agreed should be supplied at a future day, or the price of it discounted) were delivered to the Commissary of Stores at York, on the 1st of July, 1778, and on the 8th of August *475 following-, Mr. Armstead stated an account between Mr. Chevallie and the Commonwealth, making the balance of 225,3811. 9s. lid. due to the former; of which he, on the same day, obtained a certificate from Mr. Henry, the Governor, with a nota bene, that the account was to be discharged according to the contract made with Armstead on the 8th of June, 1778. Here again we find, that nothing is said about specie: but this is not all. Between the date of the certificate and the 12th of May, 1780, payments had been made so as to reduce the balance to 161,6031. 13s. exclusive of interest and Mr. Defrancy, the agent for Beaumarchais, on that day, obtained a certificate from Mr. Jefferson, the Governor, that the above sum with interest at six per cent, per annum, from the first of July, 1778, was due to Defrancy, as agent for Mr. Beaumarchais, and that his drafts for that amount, on Mr. Armstead, Commissary of Stores, would be duly honored.
How can it be believed, that Mr. Jefferson, in the year 1780, would have certified that Mr. Defrancy’s drafts for 161,6031. 13s. with almost two years’ interest at six per cent, would be duly honored, if specie had been in contemplation? Or, would Mr. Defrancy have required such a certificate, when they both knew there was neither any specie in the Treasury, nor the least prospect of procuring any?
But the counsel for the appellee, insisting that the term Virginia currency, is equivocal, have, in order to explain it, resorted to the testimony of *Mr. Picket; who says, “That a number of merchants assembled at York-Town, and offered the Supercargo of the ship Pier Eoderique, for the remainder of the goods, after tne State should be supplied, at the rate of 4s. 6d. Virginia currency, in specie, for each livre paid for the goods in Prance, payable in tobacco at 20s. per hundred weight, which offer was erected by the Supercargo, because he said that the agent for the State of Virginia had made him a better offer of 6s. for each livre, and to take the whole cargo at that price. That he believed he should accept the offer, unless they (the merchants) would give more.” But, there is nothing in all this which goes to the contract itself; nor, can any inference be justly drawn from it to support the idea that specie was contemplated. On the contrary, I think it may be fairly inferred therefrom, that Mr. Che-vallie did not expect to contract with the government for specie: for, when the Supercargo rejected the offer of the merchants, saying that the agent for the State had made him a better one, of six shillings per livre, for the whole cargo; and that he believed he should accept it, unless the merchants would give more, he appears to have been hesitating which offer to accept: but, if he had expected to have received specie from the government, could he have doubted for a moment, whether he should take six shillings the livre for his whole cargo, or 4s. 6d. for a part of it only?
Much' stress was laid, in the argument, on the loss Beaumarchais would sustain, if the contract was not considered as a specie one. But, whether he made an advantageous, or an unprofitable contract with the government, is not a proper enquiry in this Court; for, here, the only question must be, what the contract really was ; and, when that is discovered, it must be adhered to. But, it was probably not so disadvantageous to Beaumarchais as the appellee’s counsel seem to apprehend: For, by agreement between the parties, Chevallie was to retain *out of the cargo, for his own use, sundry specified articles, which were entered on the back of the contract; and, when making up his accounts in conformity thereto, he charges the whole cargo to the State, agreeably, no doubt, to the invoices laid before the Council board, and then gives credit for the several articles retained for his own use, amounting to 120,021 livres and nine sous, or 36,0061. 6s. Virginia currency, at 6s. for each livre; which was all proper enough: But, in the account of the articles retained, there is a quantity of brandy (20 pipes and 18 barrels) stated to have cost in France 12,043 livres 10 sous. The pipes are said to contain about 125 gallons each, but no mention made of the contents of the barrels. Suppose them, however, to have contained 33 gallons each; then there were 3,094 gallons, charged at almost four livres per gallon; which is more (I believe) than three times what the brandy actually cost in France. And, if the other articles were priced according to this example, the advance upon the prime cost must have covered all his losses. Besides, th'e expedition which he expected to derive from that part of the contract which related to the tobacco, was a great inducement.
There is no evidence, then, of a specie contract, unless the story of the silver dollar being laid on the Council board, and the argument of Chevallie’s being a foreigner, unacquainted with our language, are entitled to any respect: But, they have no weight, for the first is not proved, and the latter is no objection, as Chevallie was provided with interpreters.
I come now to consider the third point; whether there are circumstances in this cause, sufficient to take it out of the general scale of depreciation, as established by the act of 1781? And I think there are.
During the progress of paper , currency, tobacco was generally resorted to, in order to ascertain *the state of depreciation ; and twenty shillings per hundred having been, for some years back, about the average price of that article, were generally adopted as the standard. Comparing, then, those circumstances with the contract now under consideration, in which we find 41. per cwt. allowed for the tobacco, it strikes me very forcibly, that a depreciation of four for one was contemplated by the parties, and that they regulated their contract accordingly. But, if so, then by the express provision of 'i 5 of the act, the Court has power to adjust the contract according to that ratio; and, therefore, my opinion is, that it should be settled by a scale of four for one.
It was observed by the counsel for the Commonwealth, that the settlement made by the late Solicitor General in December, 1784, in which the monejr balance was *476 scaled at five for one, ought not to be disturbed, as Ra Til, the agent of Beaumarchais, acquiesced in it, and received sundry payments under it, without complaining. But, to this it may be answered, that La Til was the third agent of Beaumarchais, not privy to the original contract, but sent over here six years after the debt had been due, in order to collect the large balance then unpaid, which he found attended with great difficulty and obstruction; and, therefore, he was glad to receive any payments that were offered him: Besides, there is no evidence that he ever consented to the settlement of the account, scaled at five for one; and, consequently, his transactions afford no inference against the claim; especially when it is recollected that he was not dealing with an individual, upon equal terms; but was a foreigner,. just come to the countrj', contending with, and entirely in the power of a sovereign State, as he thought, and against which he did not discover that he had any compulsory remedy. Under such circumstances, I should not have thought Beaumarchais himself concluded, had he been here, transacting the business in person. Upon *the whole, I am of opinion that the decree of the Chancellor ought to be reversed; that the. balance of the money debt should be scaled at 4, instead of S for 1; and the balance of the tobacco debt at twenty, instead of sixteen shillings per hundred weight.
CARRINGTON, Judge.
That the Court had jurisdiction of the cause is very clear, for the reasons already given by the Judges; and, therefore, it is unnecessary to discuss that point any further. But, upon the merits, I am of opinion that Beaumarchais was not entitled to relief. The written contract purports upon the face of it, to be for the current money of Virginia; and, therefore, it is necessarily subject to the scale of depreciation, unless the appellee is able to shew that specie was intended. But, the inference appears to me to be directly otherwise. Eor, in the first place, it is not probable that the Executive would have contracted for specie when they had none in the Treasury, nor were likely to have any. Such a conduct would have argued such gross inattention to the honor of the country, and such perfidy towards the creditor, that it ought not to be attributed to them without the clearest proof of the fact. But, no such proof is adduced. Even the story of the silver dollar is not proved; but, if it had, the circumstance of the total absence of the precious metals as a circulating medium at the time, affords so strong a presumption that specie was not intended, that something more than the bare production of a silver dollar at the Council board ought to have been shewn, in order to remove it; because, as the performance of such a contract would have been so wholly impracticable in the then situation of the country, it seems almost impossible that the terms could have been accepted; and, therefore, where the probability is so great that a contract for specie was refused, the appellee ought to have been able to shew, not only that the silver dollar was produced, but that those terms -were accepted, *and that the contract was for specie. Instead of this, however, there is not the slightest proof of the allegation, with regard to the silver dollar; and, therefore, it nmy be laid entirely out of the case. But, there is another circumstance which has great weight, and affords a very strong inference that specie was not intended. It is this, that Beaumarchais, by the contract, agrees to allow 41. per cwt. for the tobacco; although it is stated, that it might have been bought for less than 20s. specie.
Now, how can this be accounted for, upon any other ground, than that the contract was for paper money? Would the supercargo have allowed 41. specie per cwt., for an article that he could have bought at less? The thing is impossible. These arguments are considerably strengthened by the circumstances which followed after the contract; such as the credit of the 1,3001. at the nominal value, the certificate of the Governor to Defrancy, and the long acquiescence under the Solicitor’s settlement, which all serve to explain the meaning of Chevallie, in the apprehension of all those concerned with the transaction. But, then, it is said that the circumstances entitled him to relief under § S of the act establishing the scale of depreciation, since he rejected a better offer, in specie, from the merchants; and, therefore, that he must have calculated on being paid in that medium. The only testimony on this point', is the deposition of Picket, taken ex parte, and after a great lapse of time, when many of the circumstances might have been forgotten, or not distinctíy recollected.
In this situation of things, his declarations ought to be very strong indeed, in order to outweigh the numerous circumstances leading to a belief that specie was not intended. But, instead of this, he does not profess to have been present1 when the contract was made, or to have known any thing about it. He only relates what passed between Chevallie and the merchants, who offered 4s. 6d. specie *the livre, for a part of the cargo only, to be paid in tobacco, at 20s. per cwt. But, does this prove that the whole cargo was not sold to government upon other terms? Certainly not; for, he was not present at the contract with the State, and knew nothing about it. The price offered by the merchants, forms no objection; for, as they were not known to Chevallie, he was not satisfied of their solidity, and, therefore, preferred a contract with the State, especially as he thereby got 6 per cent, interest, whereas he must have been content with five from individuals. There is, consequently, no ground for the scale adopted by the Court of Chancery; and that of four for one is equally without foundation. Eor, it is not proved that the specie price of tobacco was 20s. per cwt. ; the Auditor states it to have been less; and that position is fortified by the circumstances of the country. The scale of 4 for 1, therefore, which is bottomed on the notion that 20s. was the standard price of the article, cannot be sustained. Under every point of view, then, it appears to me, that the con *477 tract was for paper money, and that specie was not intended. The plain consequence is, that it was subject to the scale which the Auditor applied, as there is nothing to distinguish it from contracts in general of the same period. My opinion, therefore, is, that the decree of the High Court of Chancery, is altogether erroneous, and that it ought to be reversed, and the bill and petition dismissed.
PENDLETON, President.
I do not feel my passions in the least disturbed by the objection to the jurisdiction of the Judiciary over this case. It is an objection of right, which I can view in the calm lights of mild philosophy. Indeed, it cannot be supposed that any member of this Court is so fond of power, as not to have cheerfully transferred this troublesome discussion to any person that would take it, if they could have done it with propriety; but, we are as much bound to support the legitimate *powers of the Judiciary, as that, that branch is not to invade what hath been assigned to the others. It was truly said, by Mr. Hay, that the Legislative acts were uncontrollable in all things within their constitutional powers, which powers are only restrained by our Bill of Rights and Constitution. That Constitution creates three branches of government, and declares that their powers shall be kept separate and distinct, and those of one not exercised by the others. We must consider, then, what are their distinct powers: the Legislature are to form rules for the conduct of the citizens, and to make regulations for the disposition of property; they hold the sword and the purse, to be used for the purpose of defending the society against foreign invasions, or domestic insurrections; and, to come to the present purpose, it was to provide military stores and necessaries for the armj7. It is the duty of the Executive to see that all laws of a public nature are carried into execution ; and to make contracts in cases of the present nature, directed by law, and which, when made, the society are bound to perform; but they cannot originate any claim upon the public. It is the province of the Judiciary to decide all questions which may arise upon the construction of laws or contracts, as well between the government and individuals, as between citizen and citizen. They can neither make a law, or contract; but decide what the law is, upon any question before them; and, if the Legislature shall declare the construction of a law formerly passed, although that declaration will operate as a law prospectively, the Judges are not bound to adopt that construction in prior cases, unless thej7 approve of the sense declared: And this was the opinion in the case of Turner v. Turner, [1 Wash. 139]. Upon the same principle, if a contract is entered into in behalf of the government pursuant to an existing law, and a contest shall arise about the meaning of the contract, it belongs to the Judiciary to decide what the contract was, and, if the Legislature *shall decide that question, they invade the province of the Judiciary, contrary to the Constitution. But this is said, by one gentleman, to be an invasion of the State sovereignty and its attributes, and bj7 another to be a prostration of the Legislature at the feet of the Judiciary: Sounding terms ! but which would have been more properly used, when the Constitution was framing, in opposition to the creation of the three departments, than now, as objections to the exercise of the powers allotted to each. When the Federal Court decided, that a State was suable in any Court, besides the absurdity of applj’ing the ordinary process to such a suit, the States were justly alarmed at the attack upon their sovereignty; which was surely invaded by calling them into a defence in any foreign Court. I, as a citizen of Virginia, participated in feeling the wound; but my reflections on the subject then produced ths opinion, that, although a State could not be thus called upon in a foreign Court, or in its own Courts, without its consent, yet the honor and justice of every State required, that an independent tribunal should be appointed within itself, to decide upon all claims against the public ; and not leave them to the decision of a popular assembly, improper from the nature of its existence, as well as from their numbers, to decide upon contracts made; that is to say, what they are, and whether they will perform them or not: And I feel á pleasure, indeed a pride, in discovering, that the Legislature of my country had provided such a tribunal, by allowing an appeal from the Auditor of public accounts, an Executive officer, to the Judiciary, independent in the tenure and emoluments of office, and bound to decide according to the laws, on which the contract was founded; for, in that light I view the law giving the appeal, which establishes a general mode of bringing all claims against the public before that tribunal; and the general words of the law are fully sufficient for that purpose. After all, however, the Legislature have a check upon the decision ; for, the Court when they *have determined in favor of the claim, can only order the Auditor to issue warrants upon the Treasury, but the Legislature must provide a fund to answer those warrants, as the only means of giving the judgment effect. At the same time, I must be permitted to declare my opinion, that they would act dishonorably, in withholding such funds, unless in cases of very glaring injustice to the State. The situation of England, in regard to this point, has been mentioned. The petition of right was the mode adopted there for referring such claims to their Judiciary ; and although originally, in high prerogative times, it could not be proceeded upon, until the King had underwritten, Let justice be done ; yet that has long since been dispensed with, and the petition is taken up as an ordinary proceeding. That petition, and the mon-strans de droit, subjects all the claims of individuals against the Crown, or the public, to legal decision: But, the great case of the Bankers shews the effect of the controlling power of the Legislature; for, after their claim was allowed, the Legislature refused to provide a fund, until a compromise took place, by which the Bankers, agreed to receive a moiety of their claim» *478 Thus much upon a supposition, that the Legislature had rejected the legal claim of the appellee under the contract in the present case; which I do not consider to have been the case. His petition to the Assembly states his great loss under the contract, and since he entered into it to serve the United States, and Virginia in particular, and that service was essential' to the interest of both, he founds his claim upon the justice and generosity of the Legislature to compensate him for his loss by the event of the bargain. To such a claim, not a right fixed by the terms of the contract, the Legislature only could open the public purse. That body rejected it; and, it is not for this Court to say, whether they acted upon proper principles, or not: Eor, my position is, that all claims must originate with the Legislature, or they cannot be allowed by the Executive, or Judiciary; but when, as in this *case, the Executive are authorised by law to make a contract, and they do make it accordingly, if any dispute arises upon that contract, it belongs to the Judiciary to decide upon it, and not to either of the other departments. Whether the Auditor acted prudently, or not, in rejecting the claim, because it had been decided upon by the Solicitor and Executive, no more blame attaches upon him for his decision, than is attributable to an inferior Court, whose judgments are reversed by a superior tribunal. I consider the application to him, as the legal mode of bringing the question before the Judiciary. The Solicitor’s decision, which he thinks prohibited him from considering the claim, is referred to, and made a part of the record, and is to be examined, as if it had been his own. Upon the whole, I am for over-ruling the objection to-the jurisdiction. I proceed to consider the question upon the merits, which depends upon the written contract, and the testimony of Mr. Picket. Upon the contract, the payment of the money part was to be paid in Virginia currencj', which brings it, expressly, within the § 2d of the scaling act; and the only question is, whether the circumstances disclosed in the contract itself, or arising from the testimony of the witness, brings it within the § Sth of that act?
It is objected, that Beaumarchais is a foreigner, not bound by the act of 1781. But, foreigners coming here, and making contracts, have a right to sue in our Courts for a breach of such contracts, and are bound by all laws for regulating them. And here it may be necessary to consider what those prevailing circumstances are to relate to. In all former decisions they have been confined to the single point, whether the legal scale be such as met the ideas of the parties at the'time of the contract? And I think very rightly. Hill & Braxton v. Souther-land, is no exception, since there was no contract for price. No scale had been fixed till the act of 1781; and when the Legislature were providing *one to operate upon contracts during the period of five years preceding, when the paper money had been in the progress of depreciation, and made, perhaps, the best general regulation which they could adopt, yet since, in those contracts, the parties might not be sensible of any depreciation at an early day, or of one different from the legal scale, this proviso justly meant to make the legal scale yield to the real contract of the parties. It is, therefore, to the scale that the proviso is to be applied; and not to circumstances tending to shew the motives of the parties for entering into the contract, or whether the bargain was a good or a bad one, either in prospect at the time, or in event; which would indeed be, to overturn the provision in the second clause, and open a door for endless litigation : An extreme, never intended by the Legislature, and not to be adopted by this Court. On the other hand, to admit of no circumstances to prove the idea of the parties, at the time, as to the state of. the depreciation, would be wholly to reject the proviso, which the Court are equally restrained from doing. The evidence of Mr. Picket, therefore, so far as it may relate to the motives which induced the agent of Mr. Beaumarchais, to prefer the contract with the government, to one with his company of merchants, have no influence upon the question; although, I cannot help observing, without intending to reflect upon the witness, that his testimony conveys a strange idea .for that preference. They would accept the offer of the government, as better than the other, unless the merchants would give more; and yet no person can doubt but that 4s. 6d. per livre, paid in tobacco at 20s. per hundred, was a better offer than 6s. per livre, paid in tobacco, at 41. per cwt. ; at which rate a' considerable proportion of the debt was to be paid by the public. The deposition can only be regarded, so far as it may relate to the ideas of the parties as to the real depreciation ; as to which, it tends to shew that their idea was, that the difference between specie and paper was four for one; *that being the difference between the price contracted to be given for tobacco, and that to be allowed the merchants on a specie contract. The observation, that Mr. Chevallie was a stranger, unacquainted with our laws and language, has no weight with me. Intrusted with the care of so large a mercantile concern, he was, no doubt, a man of understanding and experience in such business. He was attended, in the contract, by two interpreters, and had been before surrounded by a company of speculators; who best, of any, knew the real state of depreciation; and, no doubt, in the course of their treaty, discovered to him what that state was. Eor, when they offered, in their proposals, to furnish tobacco at 20s. per hundred, in paying for the goods, he would naturally enquire, why they would sell tobacco at that price, when the country demanded for it 41. per hundred? and their answer must be as obvious, that the former was the specie price, and the latter, the price in paper; which shews the difference to have been well understood. It is immaterial what were his motives to prefer a contract with the government; for, it is sufficient that this difference in the price of tobacco conveyed to him an idea, that the depreciation was four for one, and that he contracted *479 under that idea. That such was the idea of the Executive also, is obvious from the same circumstance; if they were acquainted with the offer of the merchants, as no doubt they were, since Mr. Chevallie would naturally disclose it, in order to raise his demand upon the public; or, perhaps they might fix- the offer of the demand of four pounds per hundred, upon a well-known custom, as no scale was then fixed, of making the usual price of tobacco at 20s. specie per hundred, compared with the current price in paper, the standard by which to regulate paper contracts. To one of these the Executive must have had recourse, when they settled the price to be allowed for tobacco at 41. : Which fixes the scale at four for one in the idea of both parties; and, in my opinion, that ought to be the scale, by which that contract ought to be adjusted. *The Executive, in 177S, adjusted it at five for one, probably thinking themselves bound by the legal scale; but, as that idea has been over-ruled, by the opinion of this Court in several cases, the appellee has a right to have it corrected to four for one, unless he is barred by his acquiescence, and what has happened since.
It was not till 1785, that his agent discovered his demand was to be reduced by a scale of five for one. The agent, as was his duty, took a copy of the statement, and the Governor’s testimonial, and, no doubt, transmitted them to Erance, for his principal’s directions how he should conduct himself; which he, probably, did not receive, till 1787. What those were, does not appear; but, the agent here proceeded to receive warrants, from time to time, which he could not turn into specie, without loss. Thus, the matter continued, till 1792, when that loss made part of the appellee’s claim in his petition to the Assembly; at which time, he disclosed his objection to the settlement, and insisted that it ought to be adjusted upon the footing of a specie contract. The Eegislature directed some allowance to be made him on account of his loss by the warrants, but rejected his extensive claim. He renewed his application for the latter, in 1793, but without success; and, in April, 179S, he applied to the Auditor, in order to bring the matter before the Judiciary; and, being refused, he filed his petition of appeal, in 1796, to the High Court of Chancery. During all this period, although he continued to receive payment that were offered him, yet he never gave a release, or did any act relinquishing his claim, to which he was entitled by the contract; and, therefore, although the Court is of opinion, in which I concur, that the contract was for paper, yet my judgment is, that we are not precluded from rectifying the mistake in the settlement, which reduced the money to five, instead of four for one. It was objected, with a considerable degree of force, that, by his delay, he has deprived *the State of recourse to the United States, who ought to pay the demand; but, this is not conclusive in my mind, for two reasons: First. That, I suppose Congress will pay the money, because, I think they ought, not only upon the general principle adopted, of the war having been a common concern, but that, I believe, many of the articles purchased, were sent to the Continental army. Secondly. If they shall refuse, since the contract was made with the State government, and the delay has been occasioned by the mistake of our Executive, in adjusting the claim under it, I think the State bound by honor and justice to pay the balance arising from a correction of that mistake, although they should not be reimbursed by the Union.
This objection had considerable weight in the decision of the cases of the Commonwealth v. Banks, and others: but, there they had neglected to have their property valued, which they claimed to be allowed for, although laws had passed from time to time, directing such valuation to be made; the last of which declared, that no such claim should be allowed, unless the valuations were made within a limited time. That this was the principal ground of decision, will appear from another case, where the claim was allowed, because the property had been valued, although there was some irregularity in the proceedings, not imputable to the claimant; which the Court of Equity supplied. My opinion, therefore, is, that the money demand ought to be reduced by a scale of four for one, and the tobacco balance corrected from 16s. to 20s. per cwt. in order to correspond with (he scale. It only remains to consider the interest; which, I think, ought to be allowed, from the date of the contract in 1778, to the 6th of January, 1785, and then to stop; since the agent then knew how the adjustment was made, and ought to have proceeded to his appeal at that time, if he meant to complain of it; but, the interest ought to revive from the time of pronouncing the final decree, and be continued till payment.
*The Judges being thus all agreed, that the decree of the Court below, as it stood, was erroneous, but equally divided in opinion, whether the contract should be settled by a scale of four for one, instead of the statutory scale of five for one, a decree was entered, stating that by the unanimous opinion of the Court, the decree of the High Court of Chancery was reversed; and, on account of the division among the Judges, as to the scale, that no further decree could be made, as the case was not provided for, by the act of Assembly.
At this term the Court desired it to be argued, whether under the act of Assembly, relative to cases where the Court is divided in opinion, [May, 1779, c. 22, 10 Stat. Earg. 92,] the decree ought not to have been affirmed for the balance due according to the scale of four for one, agreeable to the opinion of the two Judges, who thought that scale ought to have been adopted?
Call and Wickham, for the appellee
The former decree ought not to have been entered. 1st. Upon general principles. 2d. Upon the act of Assembly. With respect to the first: The Court ought never to reverse farther down, than a majority of the sitting Judges concur, the Court below erred: For, that is all in which it can truly be said to contain error; since that cannot be deemed erroneous, which a majority do *480 not pronounce to be so. But, that which is not erroneous ought to be affirmed. Bor, the claim is separable in its nature; since the Court have only to say what remains after the deduction is ma^e, according to the opinion of the two Judges, who are for the lesser sum; which is all that the whole Court concur in reversing; when two think it ought not to be reversed as to the lesser sum. With respect to the second: The act plainly contemplates a partial, as well as a general reversal. Bor, the object of the Legislature was to prevent a suspension of the cause, whenever the Court should' happen to be divided in opinion; and an adequate provision was intended. But, this could not be, without extending it to a division in both cases. Bor, the difficulty of making a decree was as great, and the suspension as certain, in the case of a partial, as of a total division. Of course, if it is not within the letter, it is within the equity of the act; and the rule, in such cases, is to adopt the construction, which is agreeable to the equity of the statute. [Eyston v. Studd,] Plowd. 467. But, it is within the letter of the act: for the words, affirming in those cases where the voices shall be equal, apply as well to a part, as to the whole. It follows, therefore, that the former decree ought not to have been entered.
But, if so, the Court still set it aside, and enter the proper decree. Because, that entry was interlocutory, and the cause is still upon the docket.
Nicholas and Hay, contra.'
The term having passed, the Court cannot now make any alteration in the decree. But, if they could, this is not a case contemplated by the act; which relates to cases of a division upon the whole cause, and not upon a part only. Besides, the Chancellor and the two Judges, who were for the lesser sum, did not concur; because, he was for allowing the whole amount, and not the lesser sum only.
Cur. adv. vult.
PENDLETON, President.
Delivered the resolution of the Court as follows:
The Court have revised the decree of November, 1801, and are unanimously of opinion. 1st. That, on the equal division of the Judges in the partial affirmance of the decree, it ought to have been affirmed, as far as the two Judges thought it just, in like manner, as if the division had been on a question of a total affirmance or reversal.
2. That the Court are not precluded from correcting the mistake in the former entry, since the *record remains in Court, and the cause undecided. It would seem strange indeed, that when we are constituted to correct the errors of other Courts, we should not have power to set right our own mistakes, in the course of proceedings in a cause yet depending.
The following decree is, therefore, to be entered.
The Court having revised and maturely considered their decree of the second day of November, 1801, which left the cause undecided, is of opinion,, that the said decree ought to be, as it is hereby set aside, and the following substituted as the final decree of the Court. The Court having maturely considered the transcript of the record, and the arguments qf counsel, is of opinion, that in the contract, stated in the proceedings to have been entered into between William Armstead, as agent for the Commonwealth, and Monsieur Peter Brancis Chevallie, as agent for the said Caron Beaumarchais, the parties having stipulated for the payment in Virginia currency, such payment might be made in the paper money of the State then in circulation, and under the second! section of the act of Assembly, passed in the year 1781, entitled, “An act directing the mode of adjusting and settling the payment of certain debts and contracts,” was subject to be reduced to specie by some scale, but that under the proviso in the Stb section of that act, the Court is at liberty to enquire into the circumstances tending to shew whether the legal scale, as of the period of the contract, accorded with the idea of the parties at the time, and to that enquiry alone ought the proof to be confined, and not to extend to circumstances relative to the motives of the parties for contracting, or whether the bargain was to produce gain or loss on either side, either in prospect or event, and, therefore, that the decree of the High Court of Chancery rather making a new contract for the parties, than pursuing *their real contract, is founded upon wrong principles, and the quantum of the sum decreed erroneous. And the Court proceeding to consider what decree the said High Court of Chancery should have pronounced, were equally divided, two Judges being of opinion that the legal scale of five for one, by which the account was settled by the Executive, and according to which the said Caron Beaumarchais is paid his whole demand, was the proper scale; and, therefore, that the decree and order ought to be reversed, and the appeal from the Auditor dismissed, and two other Judges of opinion, that from the contract and other testimony in the cause, it is apparent that four for one was the scale, or relative value between paper money and specie, as contemplated' and understood by. both parties at the time of the contract, and therefore ought to be the rule of adjustment under the proviso in the scaling act before-mentioned, which would leave a balance of seven thousand seven hundred and twenty pounds fourteen shillings, still due to the appellees of the money part of the contract; that, the price of the balance due in tobacco, ought consequently to be changed from sixteen shillings to twenty shillings per cwt. which will add to the said balance seven hundred and twentj' pounds two shillings and eight pence; and, that upon the aggregate of the said balance, interest ought to be allowed' at six per centum per annum, from the first day of July, 1778, to the 1st day of January, 1785, (amounting to three thousand two’ hundred and ninety-one pounds eighteen shillings and six pence,) and then cease, as the said Caron Beaumarchais then knew of the adjustment, then did not complain of it at an earlier day; that the decree and order, therefore, ought to be affirmed as to so much, and be reversed for the residue. The voices of the Judges being thus equal, pursuant to the act of Assembly in that *481 case made, it is decreed and ordered, that the decree and order of the said High Court of Chancery be affirmed, as to the sum of eleven thousand seven hundred and thirty-two pounds, fifteen shillings *and two pence, part thereof, and be reversed as to the residue; and, that the appellees pay to the appellants, as the party substantially prevailing in this Court, their costs, expended in the prosecution of the appeal aforesaid here.